# Richmond

COMMONWEALTH OF VIRGINIA, AT RELATION OF J. E. C. DAVIS, AND OTHERS v. C. ROGER MALBON, SHERIFF OF PRINCESS ANNE COUNTY.

November 30, 1953.

Record No. 4104.

Present, Hudgins, C.J., and Spratley, Buchanan, Miller, Smith and Whittle, JJ.

The opinion states the case.

*James G. Martin & Sons, M. Earl Woodhouse* and *Robert Lee Simpson,* for the plaintiff in error.

*William L. Parker* and *Richard B. Kellam,* for the defendant in error.

HUDGINS, C.J., delivered the opinion of the court.

J. E. C. Davis, and thirteen other citizens of Princess Anne county, filed a complaint, under Code sec. 15-501, in which it was alleged that, "C. Roger Malbon is Sheriff of Princess Anne county, Virginia, and during his present term of office as such Sheriff he has been and is guilty of malfeasance, misfeasance, incompetency and gross neglect of official duty in his office as said Sheriff, and has knowingly and wilfully neglected to perform duties enjoined upon such Sheriff by law of this State, and should be removed from said office on the following grounds and for the following reasons, occurring during his present term of office as said Sheriff, to wit:

"1. He has permitted and allowed open and notorious gambling and sale of intoxicating liquor contrary to law and gambling and sale of intoxicating liquor which could have been easily prevented by him had he performed his duties during the months of July and August, 1952, at the following places in said county."

The complaint then enumerated twelve designated places in Virginia Beach and in Princess Anne county. The prayer of the complaint was "that said C. Roger Malbon be removed from said office pursuant to law."

On this complaint a rule was issued requiring the sheriff to show cause, if any he could, why he should not be removed from office. The case was docketed under the style of the Commonwealth of Virginia at relation of J. E. C. Davis and others, vs. C. Roger Malbon, Sheriff, defendant. A judgment was entered on the verdict finding defendant not guilty. From that judgment this writ of error was allowed.

The resident judge, Honorable Floyd E. Kellam, disqualified himself from presiding and thereupon Honorable R. Watson Sadler, judge of the Corporation Court of the city of Charlottesville, was designated to preside at the trial. Paul W. Ackiss, Attorney for the Commonwealth of Princess Anne county disqualified himself from prosecuting and thereupon M. Earl Woodhouse was appointed to represent the Commonwealth.

There is no substantial conflict in the testimony though there is sharp difference of opinion as to the inferences that may be drawn therefrom. The Commonwealth introduced twenty-seven witnesses, each of whom testified that on several occasions in July and August, 1952, he or she visited one or more of the twelve establishments named in the complaint and observed flagrant violations of the gambling laws and the illegal sale of intoxicants. Some of the witnesses participated in the gambling games and some bought and drank intoxicants by the glass. None of the witnesses had any trouble getting into the different establishments or in drinking and gambling therein. Indeed, several of the witnesses said they saw a number of people, variously estimated at ten to fifty persons, in various rooms participating in, or observing others playing roulette, dice, bingo, skillo or fortune.

Many of the establishments named in the complaint are within the corporate limits of Virginia Beach, a city of the second class. Others are outside the city in the county of Princess Anne. However, under the statute, Code sec. 15-94, Virginia Beach must be considered, for the purpose

of this case, as a part of the county and within the jurisdiction of the sheriff of the county.

Virginia Beach has a normal population of approximately 5,500, but during the summer months this population is increased by fifty to one hundred thousand visitors. It has a city manager under whose supervision there is a police department with a chief of police and nineteen police officers who work on eight hour shifts, twenty-four hours a day.

The population of Princess Anne county is between fifty and sixty thousand. The board of supervisors employs an executive secretary and has created a police department with a chief of police and twelve full time employees, all of whom are appointed upon request and recommendation of the board. Each is subject to removal for cause. "All police officers appointed under this act, including the chief of the department, shall be conservators of the peace in the county, and shall be charged with the enforcement throughout the confines of the county of all criminal laws of the State and all local ordinances." Chapter 21, Acts of 1944, Code sec. 15-574.

The sheriff is an officer of the court subject to its orders and directions. He is also a conservator of the peace and charged with the enforcement of all criminal laws within his jurisdiction. It is his duty, as well as the duty of the other police officers of the county and city, to investigate all violations of law and to serve criminal warrants.

C. Roger Malbon, as sheriff, employs eight deputies, four of whom are jailers and radio dispatchers; another is investigator for the Attorney for the Commonwealth. He and his deputies are charged with serving all civil processes for the circuit and trial justice courts. Ninety-five percent of his time and his deputies' time is consumed in attending court, executing orders of the court and serving civil process. While he and his deputies cooperate with the police officers of the county and city, he has no supervision or control over their activities.

The creation of two separate and distinct police depart-

ments in his county, one in Virginia Beach and the other in the county, does not relieve the sheriff of his duty to enforce the criminal laws of the State within his county. However, in the absence of evidence to the contrary, he has a right to assume that the regular police officers of the police departments are performing their duties in enforcing the criminal laws. 80 C. J. S., Sheriffs and Constables, sec. 42 (c) p. 213. On the other hand, if he knows that any such officer is deliberately ignoring or permitting violations of law, it is his duty to take proper steps to prevent and suppress such violations and prosecute the violators.

There are five military establishments in Princess Anne county with a military population exceeding twenty thousand. Each of these establishments has its own military police.

The sheriff testified, and his testimony is not contradicted, that he actively cooperated not only with the local police officers but with the military police, with inspectors of the Alcoholic Beverage Control Board, and with the State police in efforts to enforce the criminal laws within his jurisdiction. Numerous arrests had been made both in the city and in the county, but it was difficult to get convictions of illegal sales of intoxicants unless definite proof of a consummated sale was obtained. Neither he nor the other officers received any cooperation or help from the parties who frequented gambling places and nip joints. These establishments usually maintained "spotters" on the outside who warned the operators of the approach of policemen, so that frequently when the police entered, the whiskey had been destroyed and gambling paraphernalia had been removed or hidden.

The sheriff further testified that in his efforts to obtain evidence against the violators of the criminal laws, numerous search warrants had been issued but even then some delay had been encountered in gaining entrance to the different establishments; and that in order to reduce such delays to a minimum, the board of supervisors, at his request,

had adopted an ordinance prohibiting the various clubs and establishments from the use of locked doors. Notwithstanding this fact, many of the establishments maintained "spotters" who gave warning of an officer's approach so that it was still difficult to obtain sufficient evidence to secure convictions.

J. E. Moore, chief of police of Princess Anne county, testified he had sometime employed undercover men to investigate violations of law in the various nip joints in the county, but it was difficult even then to get sufficient evidence to make arrests or obtain convictions, since the "spotters" soon learned the identity of the undercover men and gave warning of an officer's approach or presence in the vicinity. He said, "It is quite a problem to police those places. If you concentrate on one place it will close for a while and maybe open under different management or maybe move, and then you have trouble to locate them again." This officer said that from June 19th to August 20th, his force investigated in the county 1,424 complaints, made 424 arrests and issued 158 summons for violations of law.

Reeves E. Johnson, chief of police of Virginia Beach, testified that in July and August, 1952, his department in Virginia Beach investigated 1,556 complaints and made 926 arrests. Most of the arrests were for violation of the traffic laws and other laws of the Commonwealth. Between forty and fifty arrests were made for violation of the gambling laws and twenty-two were for illegal sale of intoxicants.

J. Wilcox Dunn was the only one of the twenty-seven witnesses who testified that he gave the sheriff any information about violations of the law known to have occurred at any of the establishments named. This witness said he informed defendant that a friend of his had lost a considerable sum of money gambling at Piney Point. He stated that his language to the sheriff was: "Frankly, it had to do with two $500.00 checks and three $200.00 chips which

had not been collected. The checks were paid out, but whether they were cashed or not, I could not tell you. The party came from Richmond down to Piney Point on Saturday night of Memorial Day weekend, and the call came to me Monday following, and I am reporting this to you to let you know it appears to be a job of work for the Sheriff." Later he asked the sheriff what he had done about it and the sheriff replied, "I don't know anything about it." The witness replied, "It appears to me it's your job to know something about it."

The sheriff testified that Dunn did tell him about a friend losing money at Piney Point but that Mr. Dunn declined to give him the name of the party who signed the checks or to give him the cancelled checks or to give any other information about the alleged loss. The sheriff said that on the morning following the conversation with Dunn, he reported the matter to the police of the county and ask them to investigate Piney Point. So far as he knew the officers were unable to obtain any evidence of gambling there.

The defendant over the objection of the Commonwealth introduced 43 witnesses who testified that his reputation for truth, veracity, and honesty in enforcement of the law was good.

The Commonwealth's first contention is that this is a civil proceeding and therefore evidence tending to show the character of defendant was not admissible.

Courts have no inherent power to remove a public officer from office. Their authority is derived entirely from the provisions of the pertinent statutes, Code sec. 15-500 and 15-501. In some jurisdictions such proceedings are held to be civil, while in others they are regarded as criminal, or *quasi* criminal in nature. "Such statutes will be construed to conform to the legislative intent to provide a speedy remedy for the removal of corrupt and unfaithful officials, but where they may be considered penal in nature they are to be strictly construed." 67 C. J. S. Officers, sec. 67 (a) 288.

In 43 Am. Jur., Public Officers, sec. 226, p. 59, it is said: "The proceeding has been characterized as a special proceeding—a proceeding *sui generis*. The proceeding prescribed is in some states regarded as being criminal or as *quasi* criminal in nature, and in others as partaking of the nature of a civil action or proceeding, and an action at law. The courts differ in this respect even in regard to actions under similar statutes."

The proceeding in *Warren* v. *Commonwealth*, 136 Va. 573, 118 S. E. 125, under the same statute as is involved in this case, was to remove the commissioner of revenue of the city of Hopewell from office. There it was held that since the proceeding was *quasi* criminal in nature the court had no authority under Code sec. 8-352 to set aside a verdict and enter final judgment as in civil cases. At page 594 it was said: "From the language of the revisors' note, and the use of the technical terms 'civil action' in the statute, we think that the statute means to embrace only private personal actions, and not such a *quasi* criminal statutory proceeding as that before us, which is not a private or personal action—is not purely private or civil—but one which is primarily public in its nature, which although not a criminal case is one highly penal in its nature, and one in which the Commonwealth is the party plaintiff."

The Commonwealth in *Wray* v. *Commonwealth*, 191 Va. 738, 62 S. E. (2d) 889, instituted an action for the forfeiture of an automobile seized while illegally transporting intoxicants. The Commonwealth introduced evidence over the objection of Wray, the owner of the car, tending to prove that Wray was an habitual bootlegger and similar evidence with respect to some of his associates. On the question of admissibility of this evidence the court speaking through the late Mr. Justice Gregory said: "We think the Attorney General, in his brief, effectively disposes of the question of the reputation of Wray and others for being bootleggers. It is true that over the objection of the defendant Wray evidence was introduced to the effect that his reputation was

that of one trafficking in whiskey, and likewise the same evidence was given as to some of his associates in this matter. It must be noted that this is not a criminal procedure, but is one of a civil nature. In civil matters the reputation of the litigant may be shown where it is pertinent to the issue. Certainly, in a case involving illegal transportation of alcoholic beverages and the knowledge, consent and connivance of the owner of a car in its use for such purposes, the question of whether or not he bore the reputation of being a bootlegger, and those with whom he associated also bore that reputation, is relevant to the issue and may be shown. In support of this premise, see *Chrysler Roadster* v. *Commonwealth*, 152 Va. 508, 147 S. E. 243, a case in which the confiscation of an automobile was involved, and the reputation of the owner of the car and members of his family as being engaged in the illegal handling of whiskey was presented to the Court."

The vital issue before the jury in this case was whether the sheriff had knowingly and wilfully refused or neglected to perform his duties. This necessarily involved an attack on his official integrity which made character evidence admissible. It would be highly inconsistent to hold that character evidence is admissible to prove that the owner of an automobile had knowledge of its illegal use in transportation of ardent spirits and that such evidence is inadmissible to show the reputation of a public official charged with knowingly and wilfully neglecting to perform his official duties. Evidence as to these traits of character is relevant and has probative value. We, therefore, find no reversible error in the admission of evidence tending to prove the character of defendant.

Usually the number of witnesses permitted to testify as to reputation is within the sound discretion of the trial court. However, the court in exercising its discretion should permit only a reasonable number of witnesses to testify on this one issue. Too many witnesses (43 in this case) unnecessarily prolong the trial and tend to turn the case into a popularity

contest, which is contrary to the impartial administration of justice.

The Commonwealth's second contention is that the trial court erred in refusing to give the following instruction:

"The Court instructs the jury that if they believe from the evidence that the defendant did not use reasonable diligence to prevent gambling and unlawful sale of intoxicating liquor in Princess Anne county, including Virginia Beach, it is the duty of the jury to find for the plaintiff."

As heretofore stated, this court has held a proceeding to remove a public officer to be "highly penal in nature" and hence the statute must be strictly construed. Code sec. 15-500 states eight specific grounds of misconduct for which a public officer may be removed from office, only five of which are pertinent to this case, namely: malfeasance, misfeasance, incompetency, gross neglect of official duty, or knowing or wilful neglect to perform any duties enjoined upon such officer by law of this State. Failure to "use reasonable diligence to prevent gambling and unlawful sale of intoxicating liquor" is not one of the grounds included in the statute and it would have been improper for the court to add another ground to those enumerated by giving the instruction requested.

The Commonwealth's third contention is that the trial court erred in refusing to give the following instruction:

"The Court instructs the jury that if they believe from the evidence that gambling and illegal liquor sales in Princess Anne county, including Virginia Beach, was a matter of general public knowledge, then the defendant is presumed to have had such knowledge."

There is no error in the refusal of the court to give this instruction. The burden was upon the Commonwealth to prove by clear and convincing evidence that defendant had knowledge of the flagrant violations of law and that he wilfully neglected to perform his duties in regard thereto. "Knowledge" was an essential element of proof on this

part of the Commonwealth's case. Proof that a number of people knew of such violations is not sufficient, standing alone, to bring home to the defendant knowledge of such violations. It was within the province of the jury to find that defendant did have such knowledge, but there was no presumption of the fact that he did.

The presumption sought to be established by the instruction is a presumption of fact and not one of law. "As a general rule a court will always instruct a jury with reference to presumptions of law, but it will ordinarily not instruct a jury with reference to presumptions of fact, for this would be obviously an encroachment on their province, they being the judges of fact." 7 M. J., Evidence, sec. 18, p. 349.

The Commonwealth's next contention is that the court erred in giving the following instruction for defendant.

"The Court instructs the jury that the defendant is presumed as a matter of law, to be innocent of the charges contained in the complaint and this presumption of innocence must be overcome by a preponderance of affirmative evidence, and must be such as to satisfy the minds of the jury that he is guilty of one or more of the charges mentioned in the complaint."

The Commonwealth's objection to this instruction is thus stated: "This instruction puts the case almost, if not entirely, on the footing of a criminal case, required more than a preponderance of the evidence."

A very similar instruction was approved in *Rudlin* v. *Parker*, 186 Va. 647, 43 S. E. (2d) 918. In that case Parker instituted an action for damages against his employer for discharging him without cause. The employer defended the action on the ground that Parker was discharged because he made an assault upon a female patient. In approving the instructions, the court at page 653 said. "Certainly to sustain such a charge the duty was upon the defendant to do so by clear and satisfactory evidence. Courts always indulge a presumption that one is innocent of a crime charged against

him whether it be upon a criminal prosecution or in a civil action in which the defense is based upon a crime."

This proceeding being "highly penal in nature," the burden was upon the Commonwealth to prove by clear and convincing evidence that defendant was guilty of one or more of the charges enumerated in the statute, and set forth in the complaint.

In 67 C. J. S. Officers, sec. 67 (a) p. 292, it is said, "The evidence in support of the complaint must be clear and convincing. In a proceeding to remove an officer for intoxication, the evidence should be scrutinized carefully lest the act in question be utilized as a mere means of petty persecution."

The essence of the charges is that defendant was guilty of gross neglect of duty and knowingly and wilfully neglected to perform his official duties in preventing certain violations of law within his jurisdiction. Twenty-seven respectable citizens of the county testified that at various times in July and August 1952, they observed flagrant violations of gambling laws and numerous illegal sales of intoxicants at the places named in the complaint. Only one of these witnesses notified defendant of these violations and none offered him any assistance in obtaining evidence of such violations.

Defendant denied the charges and stated that he had used his honest efforts to prevent all violations of law and to obtain evidence to convict all such violators known by or reported to him. The evidence shows how active he and other police officers in the area had been in arresting and prosecuting violators of the criminal law. He put his character in issue by introducing a large number of respectable citizens of the county who said that his reputation for truth and veracity was good, as was his reputation for honesty in enforcement of the law. This good reputation was not challenged. A jury, likewise composed of the citizens of the county, after duly weighing the evidence for the Commonwealth and defendant under proper instructions of the court,

found as they had a right to find from the evidence, that defendant was not guilty of any of the charges made against him. This verdict was approved by the trial judge who heard the witnesses testify and observed their demeanor while on the stand and therefore was in a better position to pass on the merits of the case than are the members of this court. We find no reason to disturb the finding of the jury or the action of the court.

Judgment is affirmed.

*Affirmed.*